UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DESJUAN MURRAY,

                Petitioner,                Case Number 12-12202
                                                            Honorable Marianne O. Battani

v.

KENNETH MCKEE,

                Respondent.
_____/

**OPINION AND ORDER (1) DENYING PETITION FOR WRIT OF HABEAS CORPUS, (2) DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY, AND (3) GRANTING PERMISSION TO PROCEED IN FORMA PAUPERIS ON APPEAL**

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner was convicted after a jury trial in the Wayne Circuit Court of armed robbery, MICH. COMP. LAWS § 750.529, and possession of firearm during the commission of a felony. MICH. COMP. LAWS § 750.227b. The trial court sentenced him to ten-to-twenty years for the robbery conviction and consecutive two-year term for the felony-firearm conviction. The petition raises one claim: "Petitioner was denied his constitutional right to a fair trial where the judge's comments and instructions pierced the veil of impartiality. Consequently, counsel was ineffective for failing to object to the comments." The petition will be denied because the claim is without merit. The Court will also deny Petitioner a certificate of appealability, but it will grant him permission to proceed in forma pauperis on appeal.

I. Background

The charges against Petitioner arose from the armed robbery of a "Check N' Go" business located in the City of Detroit, on June 4, 2008.

Deborah Wilson, an employee of the store, testified that on the morning of June 4, 2008, she arrived at the store to open it. She noticed another vehicle, a burgundy Explorer, was parked in the parking lot. As Ms. Wilson used her key to enter the store, a man appeared behind her, put a gun to her head, and ordered her to enter the correct code to disarm the store's alarm.

Once inside the store, the man asked Ms. Wilson for her identification, which she retrieved from her purse, saying that he would take it so he could find and harm her or her family later if he anything went wrong. The man was armed with a large silver gun with a black grip handle. The man had her look out into the parking lot at the Explorer, and he explained to her that his family members were inside it, waiting for him. Ms. Wilson testified that she could see the silhouette of people sitting in the vehicle and what appeared to be a long gun.

The man told her that if the safe did not open, he would kill her. When the safe opened, the robber had Ms. Wilson place the contents, approximately $13,000 and deposit bags, in a black garbage bag for him. The man got inside the Explorer and drove away.

Ms. Wilson took note of the license plate, which read "WJONES." Ms. Wilson described the robber as an African-American male, about 18 or 19 years old, wearing a hood from his sweatshirt up over his head, a mask, blue jeans, and black shoes. She testified that at one point the man's mask slipped down to just above the robber's lips, so she could see from his eyebrows to just above his lips. Ms. Wilson identified Petitioner as

2

the robber later at a live line-up, and she again identified Petitioner in court.

Malinda Murray testified that she owns a home located at 1917 San Juan, in Detroit, and that her brother, David Murray, was using it to house some of his adopted children. On June 4, 2008, David Murray's adopted son Tony Murray was living at that address. Tony Murray's bedroom was upstairs. That day, Ms. Murray and her brothers David and Methuselah, went to the house to install sod in the backyard. In the backyard, they saw an unfamiliar vehicle, a Ford Explorer. They went inside the house to investigate, and they found that a stick that had been used to secure a window in the back bedroom was missing. They found two plastic bags in living room containing coins, money bags, and a mask. Fearing a break in, Ms. Murray called 9-1-1.

Petitioner is another of David Murray's adopted sons. Ms. Murray testified that Desjuan Murray had lived at the 1917 San Juan address in the past, but was not living there on June 4, 2008, and he did not have keys to the house on that date.

A police officer testified that in the evening of June 4, 2008, he was dispatched to a home about a possible breaking and entering. When an officer arrived at the house, the homeowners directed him to an unoccupied vehicle in their backyard, a red Ford vehicle with the license plate of "WJONES." The officer testified that the vehicle and license plate met the description of a vehicle that had been reported carjacked. Inside their home, the homeowners directed an officer to a black garbage bag on the couch of the living room. The garbage bag contained money and bank deposit slips.

That night other Detroit police officers executed a search warrant at the house. Above an attic access panel located in one of the three upstairs bedrooms, the police found two long guns, including a loaded shotgun and a loaded SKS rifle. In same bedroom, police

officers found mail addressed to Tony Murray, his paycheck stub, and a certificate of appreciation. In a first floor bedroom, police officers found items in Desjuan Murray's name with the house's address, including a court subpoena from January 2007, return receipts from February 2008, and a couple of medical papers.

Police officers also found a gray hooded sweatshirt in the first-floor bedroom. They recovered two black garbage bags on top of the couch in the living room. Inside the bags, they discovered coins, a tan bag, deposit envelopes, and a black ski mask. There was a vehicle located in the backyard that met the description of a vehicle used in several carjackings and armed robberies. Car keys found on the couch in the back first floor bedroom stared the Explorer found in the backyard.

Earlier in the trial, Ms. Wilson identified the mask and the sweatshirt as being the ones worn by the robber. Petitioner was arrested on the night of June 18, 2008 in Detroit. The arresting officer testified that while she was in the process of trying to arrest him, he threw down a gun in an alley. The officer recovered the handgun. Ms. Wilson identified the gun found in Petitioner's possession when he was arrested as the one used by the robber.

The prosecution also presented witnesses concerning other alleged bad acts. Ryan Richardson testified that she was robbed on June 9, 2008, at a Check N' Go, in Dearborn, as she worked alone. Two customers entered the store during the robbery and were detained with her by the robber. The robber took the contents of the safe, about $9,000 - $10,000. Ms. Richardson testified that the robber had a gun and was wearing a hat, a hoodie jacket, a dark fleece shirt, and black shoes with red trim. Ms. Richardson identified Petitioner as the robber. She testified that nothing was covering Petitioner's face, and she observed his face until she was instructed to lie down on the floor.

4

Ashley Clark testified that on June 2, 2008, she was in a vehicle parked on the street in front of 7603 Curtis, in Detroit, with three friends, around 11:30 pm, when a maroon colored Explorer, with the license plate of "WJONES," pulled up along side. Ms. Clark testified that a man got out of the Explorer, put a shotgun in the window of her vehicle, and demanded their purses and money. Ms. Clark testified that the robber did not have his face covered, and in court she identified Petitioner as the robber. She had previously identified Petitioner at a line-up.

A Michigan State Police forensic scientist testified regarding the DNA profile found on the sweatshirt and the ski mask recovered from the house. Both were mixed samples, meaning the sample from each item contained DNA from at least three people. The scientist testified that the mixed sample DNA profile on the sweatshirt and the mixed sample DNA profile on the ski mask were consistent with Petitioner's DNA profile. He could not be excluded as a donor to them. The scientist testified, however, that because the DNA samples on the sweatshirt and the ski mask were mixed samples, numerous people's DNA profiles would be consistent with them. For the sweatshirt, one out of every 1,100 African-Americans would have a DNA profile that was consistent with the sample found, and one out of every 1,000-to-2,000 people in general would be consistent with it. For the mask, one out of every 1,300 African-Americans would have a DNA profile that was consistent with the sample found, and one out of every 5,000 or so people in general would be consistent with it. The scientist also testified that biological relatives are more likely to have comparable DNA profiles than non-relatives.

The parties stipulated that Desjuan Murray and Tony Murray, both adopted sons of David Murray, were not blood relatives to each other. While instructing the jury that the

5

stipulation constituted evidence that they could consider, the trial court explained that this meant Desjuan Murray and Tony Murray would not have the same DNA and that this was significant in terms of the scientist's testimony that biological relatives may have similar DNA.

Petitioner testified in his own defense. He testified that on June 4, 2008, around 8:30–9:00 am, he was at home. He testified that he had not lived at the 1917 San Juan house since December 2007, though his mail was still delivered there and he still had some personal property there. One of his brothers called him later that day to tell him about the police raid. Petitioner testified that he has never been to the Check N' Go in Detroit. He testified that he was not at the San Juan house on June 4, 2008. He denied that he had even seen the sweatshirt, ski mask, firearms and other items that were introduced into evidence from the house, and he had no idea how they got there. He has no connection to the burgundy Ford Explorer, and he had never seen it before.

Regarding the handgun he had at the time of his arrest on June 18, 2008, Petitioner testified that he found it in a car that day. He was driving the car, but he was not certain who owned the car. Petitioner found the car with the keys in it, hopped in it and drove away. He denied pulling a gun on the people who had possession of the car. Petitioner found the gun in that car and threw it down in the alley when the police were going to arrest him.

After the jury had been deliberating for approximately thirty minutes, it asked to review some of the exhibits, including the surveillance video and line-up photograph. One juror also indicated that he realized that defense counsel may have previously represented him for a traffic offense. After dealing with the juror, and determining that he was impartial,

the court had the jury's oath re-administered. The court also reminded the jury that it was there job to decide the case based on the evidence presented, and it told them not to act like detectives and create something that was not there or find something beyond the evidence. The trial court replayed the surveillance video for the jury. About thirty-five minutes later, the jury returned a guilty verdict.

After the verdict, the court excused the jury, but before doing so it expressed its surprise to the jurors that it took them so long to reach a verdict in a case that it viewed was supported by overwhelming evidence of Petitioner's guilt.

The court subsequently sentenced Petitioner to ten-to-twenty years for the robbery and a consecutive two years for the felony-firearm conviction.

Petitioner subsequently pled no contest to car jacking and felony-firearm in a case relating to the Explorer. He was sentenced to another ten-to-twenty years for the car jacking and a consecutive two years for the felony-firearm conviction. This set of sentences is running concurrently with the set challenged by this petition.

Petitioner filed a delayed application for leave to appeal in the Michigan Court of Appeals, raising the following claim:

> I. Mr. Murray was denied a fair trial by the trial judge's comments and instructions to the jury, which pierced the veil of judicial impartiality, were unfairly prejudicial and undermined the presumption of innocence. Additionally, defense counsel rendered ineffective assistance by failing to object. Mr. Murray is entitled to a new trial.

The Michigan Court of Appeals issued an order denying leave to appeal "for lack of merit in the grounds presented." *People v. Murray*, No. 298028 (Mich. Ct. App. November 10, 2010).

Murray subsequently filed an application for leave to appeal in the Michigan

Supreme Court, raising the following claims:

> I. Was the Defendant-Appellant's constitutional right to an impartial jury violated where a juror admitted, during deliberations, that he may have had prior contact with defense counsel where there was not a proper and thorough inquiry into whether there was a case of extraneous influences and whether impartiality could be ensured?
>
> II. Was the Defendant-Appellant denied his constitutional right to the effective assistance of counsel by counsel's repeated failures to challenge the prosecution's case where counsel failed to request a mistrial based on a juror with extraneous influences and where counsel failed to challenge the admissibility of uncounseled identification procedures?
>
> III. Was the Defendant-Appellant denied his constitutional right to a fair trial and the assistance of counsel where there was a post-arrest lineup in which counsel for the Defendant-Appellant was not present at any time as this is considered a critical stage of the proceedings and was the Defendant-Appellant's Fifth Amendment right violated where due process prohibits identification testimony which derives from impermissibly suggestive procedures?

The Michigan Supreme Court denied the application because it was not persuaded that the questions presented should be reviewed by the Court. *People v. Murray*, 797 N.W.2d 159 (Mich. 2011)(table).

Petitioner then filed the instant petition, asserting the claim that he presented to the Michigan Court of Appeals.

## II. Standard of Review

28 U.S.C. § 2254(d), as amended by The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as

>determined by the Supreme Court of the United States; or
>
>(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. Williams v. Taylor, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." Id. at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 410-11.

The Supreme Court has explained that "[A] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,'and 'demands that state-court decisions be given the benefit of the doubt.'" Renico v. Lett, 130 S. Ct. 1855, 1862 (2010)((quoting Lindh v. Murphy, 521 U.S. 320, 333, n. 7 (1997); Woodford v. Viscotti, 537 U.S. 19, 24 (2002)(per curiam)). "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 131 S. Ct. 770, 786 (2011)(citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary

9

conclusion was unreasonable." Id. (citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003). Furthermore, pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or...could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. Id.

"[I]f this standard is difficult to meet, that is because it was meant to be." Harrington, 131 S. Ct. at 786. Although 28 U.S.C. § 2254(d), as amended by the AEDPA, does not completely bar federal courts from relitigating claims that have previously been rejected in the state courts, it preserves the authority for a federal court to grant habeas relief only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" the Supreme Court's precedents. Id. Indeed, "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Id. (citing Jackson v. Virginia, 443 U.S. 307, 332, n. 5 (1979))(Stevens, J., concurring in judgment)). Thus, a "readiness to attribute error [to a state court] is inconsistent with the presumption that state courts know and follow the law." Woodford, 537 U.S. at 24. Therefore, in order to obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, 131 S. Ct. at 786-87.

### III. Discussion

Petitioner asserts that the trial court's comments indicated that he was not impartial.

First, Petitioner argues that the trial court unnecessarily highlighted the importance of the stipulation that Petitioner was not a blood relative of his adopted brother. By doing so, Petitioner argues that the trial court implied that his brother could not have committed the crime. Next, Petitioner argues that the trial court's admonishment to the jury to not act like detectives suggested that he desired to have them quickly return a guilty verdict. Petitioner also asserts that his counsel provided ineffective assistance when he failed to object to the trial court's comments.

Respondent argues that review of the claims is barred by the concurrent sentence doctrine. Respondent explains that because Petitioner is also serving another set of sentences that are equal to, and being served concurrently with, the ones Petitioner attacks in his petition, that the Court cannot grant any meaningful relief. That is, even if the Court were to grant relief, Petitioner would remained imprisoned for the same amount of time. Respondent also asserts that Petitioner's claim is unexhausted because it was not presented to the Michigan Supreme Court.

The Court need not address Respondent's procedural defenses because Petitioner's claim is meritless.

Under clearly established Supreme Court law, a trial judge may comment on the evidence:

> In a trial by jury in a federal court, the judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law. . . . In charging the jury, the trial judge is not limited to instructions of an abstract sort. It is within his province, whenever he thinks it necessary, to assist the jury in arriving at a just conclusion by explaining and commenting on the evidence, by drawing their attention to the parts of it which he thinks important, and he may express his opinion upon the facts, provided he makes it clear to the jury that all matters of fact are submitted to their determination. . . . This privilege of the judge to comment

11

> on the facts has its inherent limitations. His discretion is not arbitrary and uncontrolled, but judicial, to be exercised in conformity with the standards governing the judicial office. In commenting upon testimony he may not assume the role of a witness. He may analyze and dissect the evidence, but he may not either distort it or add to it. His privilege of comment in order to give appropriate assistance to the jury is too important to be left without safeguards against abuses.

Quercia v. United States, 289 U.S. 466, 469-470 (1933).

When commenting on the evidence, however, the trial judge must take great care to avoid undue prejudice of the jury. United States v. Seago, 930 F.2d 482, 492 (6th Cir. 1991). Accordingly, "[a] judge may assist the jury in arriving at a just conclusion by explaining and commenting on the evidence, by drawing the jury's attention to the parts of the evidence he or she thinks are important, and by expressing an opinion, provided that the judge informs the jury that all matters of fact are subject to their determination." U.S. v. Pratt, 239 F.3d 640, 645 (4th Cir. 2001).

To sustain an allegation of bias by a state trial judge as a grounds for habeas relief, a habeas petitioner must factually demonstrate that during the trial the judge assumed an attitude which went further than an expression of his or her personal opinion and impressed the jury as being more than an impartial observer. Hines v. Redman, 805 F.2d 1034, 1986 WL 18068, * 2 (6th Cir. October 30, 1986). To entitle a habeas petitioner to relief, a trial court's statements indicating bias must be "so extreme as to display clear inability to render fair judgment." Liteky v. United States, 510 U.S. 540, 551 (1994); see also Getsy v. Mitchell, 495 F.3d 295, 311 (6th Cir. 2007) (en banc).

With respect to Petitioner's first allegation of judicial misconduct, the trial court made the following comment after the parties stipulated that Petitioner and his brother were not blood relations:

12

> [Prosecutor]: The People and the defense are ready to stipulate that Desjuan Murray and the adopted son of - - the other adopted son of David Murray, Tony Murray, are not blood related.
>
> [Defense Counsel]: That's correct, sir.
>
> The Court: Okay. Members of the jury, again, I said to you yesterday that normally what the lawyers say is not evidence in the case. An exception to that is what we refer to as a stipulation. That's an agreed upon set of facts or circumstances between the lawyers. It doesn't require we bring in someone to testify to that because it's not an issue being raised about that. I think you can understand the possible significance of that. Then the other person, in terms of the DNA testimony here, about whether or not somebody else who may have similar DNA by being related to the Defendant, that the brother here is not blood related, which means that their DNA would not be the same.

Tr. II, at 66.

Although the comment was probably unnecessary, it was not improper for the trial court to comment on the relevance of the stipulation. He neither distorted the evidence, nor did he add to it. The DNA expert testified on cross-examination that brothers and sisters will share some DNA types because they get half of the DNA from the mother and half from the father. Tr. II, at 55. The comment after the stipulation merely indicated that line of cross-examination was not particularly relevant to this case because Petitioner and his brothers had all been adopted and were not related by blood. A trial judge is permitted to clarify issues and, as here, call the jury's attention to whether evidence is important. See, e.g., United States v. Wilson, 16 F.3d 1027, 1031 (9th Cir.1994).

Moreover, during jury instructions, the trial court cautioned the jury regarding comments it made during the trial. It stated that its "comments, rulings, questions, and instructions" were not evidence for the jury to consider during deliberations. Tr. II, at 123-24. The trial court also instructed the jury that:

13

> [W]hen I make a comment or give an instruction, I'm not trying to influence your vote or express a personal opinion about the case. If you believe that I have an opinion about how you should decide this case, you must pay no attention to that opinion. You are the only judges of the facts and you should decide this case from the evidence.

Tr. II, at 124.

These instructions safeguarded Petitioner's right to ensure that the jury–not the trial court–determined the facts of the case and rendered a verdict that was not unduly influenced by comments made by the court.

Petitioner's second allegation stems from the trial court's decision to re-read the jury oath and re-instruct the jury after it received the note requesting to view some of the evidence. The trial court had also received information that one of the jurors was possibly represented by trial counsel in a traffic matter. After the trial court replayed the requested video, it addressed the juror matter. The juror was not sure if trial counsel represented him, and trial counsel had no recollection of the juror. The juror stated that even if it defense counsel had represented him, it would not be a factor in looking at the evidence or deciding the case. The trial court then re-administered the jury oath and polled the jury about understanding and abiding by the oath. Tr. II, at 145-46. The trial court then re-instructed the jury on its duty to base its decision on the evidence or lack of evidence:

> Members of the jury, I wanted to just be sure that there is nothing here other than the evidence here to make sure that you are deciding the case on. Because if there is something that you think comes up and it might be a factor - - and I appreciate Mr. Morris to let us know about that. But remember that you have taken an oath, members of the jury, to return a true and just verdict that is based only on the evidence and my instructions on the law. You must not let sympathy or prejudice or any other factor influence your decision but the evidence in the case.
>
> As jurors you must decide what the facts of this case are. This is your job and nobody else's. You must think about all the evidence and the

14

> testimony and then decide what each piece of evidence means and how important you think it is. And this includes whether you believe what the person's said to testify in the case. What you decide about any fact in this case is final.
>
> I say this because, members of the jury, quite often when I see the things that you are asking to see here, and, you know, in terms of the video, the window, the photo lineup, but obviously someone may think that they have a reason for it, but look at all of the evidence in the entire case.
>
> You as jurors are to decide the case on the evidence that has been put before you in the course of this trial and the law that I have given you. You don't go in - - and I say this because I talked with jurors quite often after cases are over and jurors get caught up in ancillary matters. You're not detectives, you're not police, you are not to go in and create something that isn't there. You look at the case, the evidence, lack of evidence and make a decision on whether the evidence does or does not prove beyond a reasonable doubt the elements of the charge and does it prove that this Defendant committed the crimes for which is charged here when you weight all of the evidence. You don't go in and try to create things that are not there or find something else beyond the evidence as if you are a detective or police officer or something else beyond that. So, you know, you decide the case on the evidence and the law that I have given you.

Tr. II, at 146-48.

Petitioner asserts that the last part of this instruction rendered his trial unfair because it suggested to the jury that it not take a close look at the evidence. Petitioner speculates that the jury may have had doubts about the prosecutor's case founded on the video tape or line-up photograph. Respondent, on the other hand, speculates that the trial court was attempting to protect Petitioner's rights by warning the jury against conducting experiments or considering extraneous facts during deliberations. In fact, it is not clear what the trial court was attempting to accomplish by this statement. But because this case is governed by the AEDPA, the Court will not presume that the comments worked to Petitioner's disadvantage. Rather, it was reasonable for the state courts to conclude that the comments were not "so extreme as to display clear inability to render fair judgment."

Liteky, supra. Despite the language regarding not acting like detectives, the thrust of the comment reminded the jury that it's obligation was to decided the case based on the evidence or lack of evidence presented. It wanted to ensure that the jury did not consider things "beyond the evidence as if you are a detective or police officer or something else beyond that. . . ." Read in contest, the state court's could reasonably find that the statement did not render Petitioner's trial unfair.

Petitioner finally asserts that his trial counsel was ineffective for failing to object to the comments of the trial court. However, counsel cannot be deemed to have been ineffective for failing to make a meritless objection. Harris v. United States, 204 F.3d. 681, 683 (6th Cir. 2000). Because the trial court's comments did not render Petitioner's trial unfair, his counsel was not ineffective for failing to raise such an objection.

## IV. Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473 (2000). The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability. While the Court denies a certificate of appealability, it finds that Petitioner's claims are not so frivolous so as to Petitioner him permission to proceed on appeal in forma pauperis.

V. Conclusion

Accordingly, the Court **DENIES WITH PREJUDICE** the petition for a writ of habeas corpus. The Court further **DENIES** a certificate of appealability, but **GRANTS** permission to proceed on appeal in forma pauperis.

**SO ORDERED.**

        s/Marianne O. Batani
        Honorable Marianne O. Battani
        United States District Judge

Dated: October 23, 2013

CERTIFICATE OF SERVICE

I hereby certify that on the above date a copy of this Opinion and Order was served upon the Petitioner via ordinary U.S. Mail and Counsel for the Respondent, electronically.

        s/Bernadette M. Thebolt
        Case Manager